487 So.2d 1219 (1986)
Beth Alyson ESDALE (Cohen), Appellant,
v.
Richard ESDALE, Appellee.
No. 85-544.
District Court of Appeal of Florida, Fourth District.
May 7, 1986.
Caryn S. Grainer, Fort Lauderdale, for appellant.
Lewis A. Hoffman and Thomas D. Koch of Hoffman & Koch, Dunedin, for appellee.
LETTS, Judge.
In a dissolution proceeding, the trial court ordered shared parental responsibility but granted physical custody of the six-year-old male child to the father. The mother appeals. We affirm.
This is a tragic case. The mother alleges that the father sexually abused the child; however, the court determined as trier of the fact that such accusations were falsely made by the mother in order to regain primary custody. There is competent substantial evidence in the record to support the trial judge's conclusion, but there is also evidence which might have supported a finding of sexual abuse. This latter evidence is most troubling. Equally troubling is evidence that the mother lives with her paramour and that they use cocaine, valium and alcohol to excess.
The granting of the primary physical custody to the father must not have been an easy decision for this much respected trial judge to make. Were we to reverse him, we would be making an impermissible substitution of our judgment for that of the trial court. Pulitzer v. Pulitzer, 449 So.2d 370 (Fla. 4th DCA 1984), pet. for rev. denied, 458 So.2d 273 (Fla. 1984).
We applaud the trial court's decision to retain the services of a guardian ad litem to report to the court for a period of six months after the date of the final judgment now appealed. Further, recognizing the child's best interests as paramount, an award of physical custody is never final if substantial changed circumstances take place. Bennett v. Bennett, 73 So.2d 274 (Fla. 1954); Frye v. Frye, 205 So.2d 310 (Fla. 4th DCA 1967); McIntyre v. McIntyre, 452 So.2d 14 (Fla. 1st DCA 1984).
AFFIRMED.
DELL, J., concurs.
GLICKSTEIN, J., concurs specially with opinion.
*1220 GLICKSTEIN, Judge, concurring specially.
1. I first wrote a seven-page dissent in this case, specifying eight separate reasons for reversal, then abandoned it altogether because of Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980). To those workers on Broward County's child protection team and at Kids in Distress who are unfamiliar with Canakaris, the effect of that decision is to prevent (or try to prevent) us appellate judges from substituting our judgment for the reasonable judgment of trial judges. In objectively deciding if the trial judge acted reasonably here, thus within the bounds of his discretionary power, I have to recognize the ledger sheet before him. While he had the testimony of the above workers, as well as that of the guardian ad litem and the opinion of the team psychologist that the child had been abused by the father, he also had the opinion testimony of the psychiatrist that the father was not a child abuser; the testimony of an HRS case worker who provided the court with a statement of the mother, apparently in late July, 1984, which the trial judge must have interpreted as meaning that the mother was the source of the child's initial descriptions to the team in June; the testimony of the mother's relatives by marriage that the allegations of abuse were the mother's admitted fabrication; and the testimony of the mother's father that his son-in-law was a good father.
2. This case illustrates why there is criticism of the present adversarial system in resolving the issue of what is best for a child. At the trial level, we have witnessed an acrimonious fight between the parties, which drew into its arena relatives and neighbors and contradictory opinions of experts. The result is a judgment that another trial judge, just as reasonably as the one involved here, could have decided in favor of the mother, based on the evidence she and her witnesses provided. Moreover, the system involved two trial judges  one to consider dependency and the other to consider dissolution. In sum, we have a total absence of absolutes in a very hostile setting at great expense to the parties and the taxpayers.
At the appellate level, because of Canakaris, the matter has been drawn out even further without hope of reversal and at great expense to the parties and the taxpayers.
Some of us feel that mediation has to be an improvement when deciding what is best for a child. All of the recommendations in this regard by the Florida Governor's Commission on Child Support are recited in the writer's concurring opinion in Jones v. Bowman, 479 So.2d 772 (Fla. 4th DCA 1985).
The only behavior the adversary system appears to involve is the question:
Is the witness telling the truth?
Our lack of sensitivity to the behavioral sciences and the humanness of those caught up in the system is neither complimentary to us nor realistic. Our becoming lawyers and judges without knowledge of or concern with the study of human behavior is a grave deficiency, in my view. I doubt that we obtain such knowledge by employing and listening to partisan experts under the present system.
The American Judicature Society has devoted its February-March, 1986 Journal to the subject, Alternative Dispute Resolution (ADR) and the Courts. In a review there of S. Goldberg, E. Green and F. Sander, Dispute Resolution (1985), the reviewer says:
In the 1980s we sit listening to a cacophony of voices talking about dispute resolution for a number of different reasons and raising a number of different values, rationales and justifications for a wide variety of different proposals. The social forces which join to bring us this interest in dispute resolution  both practical and theoretical  are themselves sometimes in dispute or conflict. Is ADR outside of courts being suggested at a time when certain groups have recently obtained their rights in civil rights, torts, or warranties? Are the *1221 well-endowed better able to buy the dispute resolution device that best meets their needs? Has one wing of ADR, motivated by cost savings and efficiency, coopted the process begun by others seeking humane values in the resolution of disputes?
Thus, the timing of interest in dispute resolution is propitious. Activists, theorists and practitioners alike have come to understand that courts and court-like adjudication is not the only way to resolve a dispute. Given the many different ways disputes can be resolved, we should consider, study and, in the law schools, teach about all of them so that dispute resolvers  lawyers, judges and clients  can make intelligent judgments about which forms to use and why. Most important, we can begin to ask, as Lon Fuller did in 1962, what are the different moralities of each dispute resolution device (p. 248), and what are the social, political and jurisprudential effects of choosing one form or another. Our consideration of these issues will be greatly enhanced by works like Dispute Resolution which brings these themes and issues to the forefront of our attention, rather than at the periphery such as in speeches, instead of cases, in digressions in civil procedure instead of in courses on dispute resolution, and in sidelights in litigation training rather than training of its own.[7]
[7] Only recently have such trial training organizations as the National Institute for Trial Advocacy (NITA) begun to offer training in such dispute resolving skills as negotiation.
Menkel-Meadow, Book Review, 69 Judicature 300, 300-01 (1986).
The significance of our attention to the human behavior of parties is spelled out in a current review of J. Folberg & A. Taylor, Mediation: A Comprehensive Guide to Resolving Conflicts Without Litigation (1984). The reviewer says:
Mediation is not presented here as a panacea for existing ills of our judicial institutions, but rather as a dynamic process that must be understood before being applied and one that can be particularly helpful in a number of different kinds of disputes, including family conflicts and divorces.
The model discussed at length is one of a number of generic models of mediation currently in use. Students, researchers, and practitioners will find the discussion informative even if they have only limited exposure to this or other models of mediation. Of particular note are (1) repeated references to select social-psychological paradigms that underscore the complexity of conflict, (2) attention to behavioral characteristics of people involved in confrontations, and (3) the discussion of stages through which people progress as they attempt to address differences.
Herrman, Book Review, 19 Fam.L.Q. 465 (1986).
3. We lawyers and judges do not fully understand nor appreciate the emotional stress and possible debilitation that occurs when adults are engaged in adversarial proceedings upon issues that touch their deepest personal feelings. A lawyer confidently strides into the courthouse. To the client, it is like being wheeled into the operating room for the removal of cancer. Fear, gut-wrenching uncertainty and ignorance control the client's emotions, as he or she realizes that his or her future or that of a child, is being controlled by two lawyers and a stranger wearing a black robe instead of a surgical mask, all of whom are engaged in procedures that are completely foreign. Added to the foregoing is the embarrassment or humiliation of public airing of deeply personal matters. If such a system reduces otherwise strong, self-directed adults to depressed and possibly poorly functioning individuals, what does it do to a child who is the subject of such proceeding? Even adult children of the parties are grievously traumatized by their parents' acrimonious dissolutions. What chance do minor children have to escape the fall-out when they are the subject matter?
*1222 4. I am disturbed that the trial judge interviewed the child without a court reporter to provide us with that dialogue. To me it created a problem of uncertainty and raised unanswered questions. Jones v. Jones involved a reported interview; and my opinion there cited two publications as suggested resources for trial judges involved in these interviews. Our entire view of this child is synthesized wholly from the perceptions of adults. It would have been preferable to read the child's words.
5. Notwithstanding my attempts to explain matters, I am concerned that the child protection team and Kids in Distress may well think my explanations are judicial gobbledegook. It is critical that those involved in child caring have confidence in the judiciary and our decisions. They are the ones who see and hold these children; they feel the love, anger, frustration and hope that personal contact with children can only produce. It is equally critical that we judges express and appear to express a balance of common sense and sensitivity. The late Dr. C. Henry Kempe, whose child protection team in Denver was the first, and the role model for all of such teams in Florida and throughout the nation, said that the judiciary generally did the right thing where children were involved, if fully informed. All of us in this judicial district could benefit from the creativity of Robert E. (Bud) Cramer, Jr., District Attorney of Madison County, Alabama, whose informative article, The District Attorney as a Mobilizer in a Community Approach to Child Sexual Abuse, 40 U. Miami L.Rev. 209 (1985), describes the success of his initiatives. He writes:
The Children's Advocacy Center program incorporates an "advanced" team approach to handling reported cases of child sexual abuse. It demonstrates a unique and successful community approach to interagency management. The project streamlines and consolidates agency and professional involvement.
The Children's Advocacy Center is located in a house in Huntsville, Alabama. The task force chose a house rather than an office building because it symbolized a non-institutional approach to handling the child sexual abuse cases. By agreement, all of the community agencies involved in these cases coordinate their activities through the Center. A detective acts as the Center's liaison to each of the law enforcement agencies. An Assistant District Attorney acts as the Center's liaison to the District Attorney's Office. A social worker acts as liaison to the protective service agency. The liaisons comprise the program staff. The administrative staff includes a program coordinator and clerical support.
By written agency agreement, the agencies refer all reports of child sexual abuse to the Center. Rather than visiting police departments, protective service offices, hospital emergency rooms, mental health treatment facilities, and the prosecutor's office, the children visit only the Center.
The child victim's initial contact at the Center is with a member of the interviewing team. The interviewing team is selected carefully from protective service and law enforcement personnel. The Center pays careful attention to the interviewing methods. There are three interview rooms, each designed for a different age group. There is a playroom for very young victims and two other rooms for older victims.
Interviews are conducted by a team member and are videotaped when appropriate. They may be conducted in phases or sessions. Normally, children will not tell the full story in one interview. The interviewer begins by establishing a trust relationship with the child. She gives the child a tour of the house and allows the child to inspect every room. We want the children to feel that the Center is their special place.
At the completion of the interview, the child, and when appropriate, the family, are referred for therapy. The Center contacts the therapist; therapy sessions are held initially at the Center. We feel it is important that all of the child's *1223 introductions to agency representatives occur at the Center, on the child's "turf."
Once the initial interview is completed, the interviewer presents the case at one of the biweekly team review sessions. If the interview was videotaped, it may be shown at the review session. When the child completes the initial therapy session, the therapist becomes part of the review team.
Less than one-half of the reported child sexual abuse cases are referred to the criminal justice system. Contrary to common belief, the child and family may benefit from involvement in the criminal justice system. This can only be accomplished with a sensitive and patient approach to the child and the child's family. It cannot be accomplished without the involvement of a therapist and an advocate from the criminal justice system.
In our system, this advocate is the District Attorney's Victim-Witness Coordinator (Coordinator). The Coordinator maintains close contact with the child and may even visit the child's home. When appropriate, the child, family, and therapist contribute to the decision of whether the case will be routed to the criminal justice system. If a criminal case is accepted for prosecution, the Coordinator introduces the child to the Assistant District Attorney responsible for prosecuting the case. The introduction occurs at the Center, after the Assistant District Attorney has had an opportunity to review the notes or videotape of the initial interview session and has participated in team review of the case.
Prior to the trial, the Coordinator explains the criminal justice system and gives the child a tour of the Grand Jury Room and courtrooms. The Coordinator accompanies the child during the actual courtroom sessions.
Id. at 213-14.
6. Finally, we are reviewing a final judgment with respect to the primary physical residence of a small child; yet, with the extensions requested, one year has come and gone since the entry of that judgment. We expedite children's cases in our court when requests are made; and to review this case at such late date, to me, could be locking the empty barn, given no input as to circumstances in the last year.